(C. D. 1200)

TICE & LYNCH v. UNITED STATES

United States Customs Court, Second Division

(Decided December 28, 1949)

*Jordan & Klingaman* (*Jacob L. Klingaman* of counsel) for the plaintiff.
*David N. Edelstein*, Assistant Attorney General (*Chauncey E. Wilowski*, special attorney), for the defendant.

Before LAWRENCE and RAO, Judges; FORD, J., not participating

RAO, Judge: The instant protest raises the question of the proper classification, under the Tariff Act of 1930, of certain articles invoiced as—

> Twenty Cartons, Magazines
> 4000 Copies Bizarre
> December Issue

The collector of customs assessed duty thereon at the rate of 20 per centum ad valorem, pursuant to the provisions of paragraph 1410 of said act, as modified by the trade agreement with the United Kingdom, 74 Treas. Dec. 253, T. D. 49753, as pamphlets other than those of *bona fide* foreign authorship. It was claimed in the protest that the merchandise is free of duty under paragraph 1726 of said act, as periodicals. By amendment to the protest, it was alternatively claimed that the merchandise is dutiable at only 7½ per centum ad valorem, pursuant to the provisions of said paragraph 1410, as modified by said trade agreement, as printed matter, pamphlets, or books of *bona fide* foreign authorship.

It appears that the involved publication is a species of satire on women's attire. With certain exceptions hereinafter noted, it was written, composed, edited, and produced by one J. S. Coutts, a citizen of Australia, who had the magazine printed in Canada and thereafter caused it to be imported into the United States. Mr. Coutts testified that it was his intention to publish the magazine in monthly editions but, owing to the then-existing shortage of paper, it was not feasible to

carry out such intention. Instead, he was able to publish only three subsequent issues. These were printed in New York and came out at varying intervals during the year 1946. Thereafter, the project was abandoned.

A magazine which the witness stated was one of the 4,000 copies imported was received in evidence as plaintiff's exhibit 1. Although the invoice indicates the date of this magazine to be December 1945, whereas the printed date appearing thereon is January 1946, nevertheless, the witness affirmed that exhibit 1 was in fact included in the instant importation. Furthermore, he stated that the imported magazines constituted the first issue of this publication, despite the fact that exhibit 1 bears the printed legend, "Vol. 2."

Paragraph 1410 of the Tariff Act of 1930, as modified by the trade agreement with the United Kingdom, 74 Treas. Dec. 253, T. D. 49753, provides as follows:

| Tariff Act of 1930; paragraph | Description of article | Rate of duty |
|---|---|---|
| 1410 | Unbound books of all kinds, bound books of all kinds except those bound wholly or in part in leather, sheets or printed pages of books bound wholly or in part in leather, pamphlets, music in books or sheets, and printed matter, all the foregoing not specially provided for (except unbound or bound prayer books and sheets or printed pages of prayer books; except tourist literature containing historical, geographic, time table, travel, hotel, or similar information, chiefly with respect to places or travel facilities outside the continental United States; and except diaries): | |
| | If of bona fide foreign authorship | 7½% ad val. |
| | All other | 20% ad val. |

Paragraph 1726 of the Tariff Act of 1930, upon which the claim for free entry is predicated, contains the following provision:

Newspapers, * * * and periodicals; but the term "periodicals" as herein used shall be understood to embrace only unbound or paper-covered publications issued within six months of the time of entry, devoted to current literature of the day, or containing current literature as a predominant feature, and issued regularly at stated periods, as weekly, monthly, or quarterly, and bearing the date of issue.

It is at once apparent that Congress did not intend to accord free entry to every publication which might fall within the common meaning of the term "periodical." Preferential tariff treatment is to be accorded to those only which meet the specific requirements of that term as set forth in the paragraph. To fall within its scope, the publication must be unbound or paper covered, issued within 6

months of the time of entry, devoted to current literature of the day, or containing current literature as a predominant feature, issued regularly at stated periods, and it must bear the date of issue. If any single one of these characteristics is lacking, the provisions of the paragraph may not be invoked.

Issue is joined between respective counsel herein over the questions of whether the instant merchandise is devoted to current literature of the day or contains current literature as a predominant feature, and whether the magazine was issued regularly at stated periods. With respect to the first of these two questions, there is sufficient authority to support the contention of the plaintiff that this publication is in fact devoted to current literature.

Paragraph 1726, *supra*, in substantially its present form, has been a part of all tariff legislation enacted since 1890 and the phrase "containing current literature," appearing therein, has frequently been construed.

In the case of *Alex. Murphy & Co.* v. *United States*, T. D. 20037, G. A. 4259, decided under the Tariff Act of 1897, the question for determination was whether certain law periodicals were literature within the meaning of paragraph 621 of that act. In holding that they were, and that therefore they contained "current literature," the Board of General Appraisers (now the United States Customs Court) stated:

The term literature, broadly used, would cover all written or printed productions of the human mind from the story of Little Red Riding Hood through fiction, belles lettres, art, literature, medical literature, etc., up to the most abstruse scientific expositions.

"In a restricted sense," says the Standard Dictionary, "literature is the portion of literary productions that excludes the positive sciences." But we have no reason to suppose that the term is used in a restricted sense in the tariff.

In *Richards et al.* v. *United States*, 91 Fed. 516, it was held that a fashion periodical, consisting of notes upon, and a letter concerning, ladies' current fashions, was "clearly enough, current literature of the day, to make the periodical free" under paragraph 562 of the Tariff Act of 1894. See also *P. H. Petry & Co.* v. *United States*, T. D. 19453, G. A. 4170.

In the light of these authorities, and in view of the fact that plaintiff's exhibit 1 is devoted entirely to current comments on women's current fashions, it is plain that it contains current literature as a predominant feature.

We come now to a consideration of whether the involved magazine was "issued regularly at stated periods." In this connection, it was established that, although the editor of the magazine had intended to publish it in monthly editions, his purpose could not be fulfilled because of a paper shortage, and that, therefore, the magazine was

printed on only four occasions during 1946, but not at regular intervals. The paragraph specifically requires that in order for a publication to be deemed a periodical it must be "issued *regularly* at stated periods." [Italics ours.] Mere intention to comply with the terms of the provision would, in our opinion, not be sufficient to establish its applicability, if the proof indicates that the intention was never effectuated. Irrespective of what factors may have intervened to prevent the publication of the magazine regularly at stated periods, as weekly, monthly, or quarterly, since it was not so published, the terms of the provision remain unsatisfied. *Williams & Wilkins Co.* v. *United States*, 22 Cust. Ct. 268, Abstract 52955. Since this court is lacking in equity jurisdiction (*Jacksonville Paper Co., a Corporation* v. *United States*, 30 C. C. P. A. (Customs) 159, C. A. D. 228), it cannot consider the extraneous circumstances which prevented the publication of this magazine at regular intervals.

Furthermore, there is nothing in the record to indicate that these magazines were ever issued in a foreign country. From all that appears in this case, it is a fair assumption that the entire edition of this publication was imported into the United States for distribution here, and that the magazines were never offered for sale in Canada. In order to find classification within the provisions of paragraph 1726, *supra*, it is essential that the magazine shall have been issued as a periodical before it reaches the port of entry. See *New York Daily News* v. *United States*, 65 Fed. 493, and *Albert and Charles Boni (Inc.)* v. *United States*, 19 C. C. P. A. (Customs) 22, T. D. 44853, in which latter case the court stated (p. 24):

\* \* \* When the law provides that the imported publication shall bear the date of issue plainly it refers to the date of issue of such periodical in the foreign country from which it comes. \* \* \*

The word "issue" is defined in Webster's New International Dictionary of the English Language, 1948 edition, as follows:

9. Act of sending out, or causing to go forth; delivery; issuance; as, the *issue* of an order of money.

Clearly such definition presupposes something more than merely printing and dating the publication. Some element of delivery or distribution must exist before it may properly be said that a magazine has been issued as a periodical before it was imported into the United States.

We find, therefore, that the imported magazines were not "issued regularly at stated periods" within the meaning of paragraph 1726, *supra*, and the claim for free entry thereunder is denied.

The record herein likewise fails to establish the alternative claim that this merchandise should be classified under paragraph 1410 of the Tariff Act of 1930, as modified by the trade agreement with the United Kingdom, *supra*, as printed matter, pamphlets, or books of

9

*bona fide* foreign authorship. Plaintiff's exhibit 1 is a magazine containing 49 pages of printed material. All of the articles included therein were written by the editor, the aforementioned J. S. Coutts. He also drew all of the illustrations and took all of the photographs. However, the publication contains 10 pages of letters to the editor, concerning which the testimony is as follows:

X Q. And what do you mean by some of the letters may have been written by an American?—A. Well, I don't know offhand.

X Q. Letters published in that magazine, isn't that so?—A. Yes.

 * * * * * * *

X Q. Will you please point out to me what letters, if any, were written by American authors in that publication?—A. I couldn't. You see the letters are so old, these letters were compiled before the war, 1939, and I had all the stuff ready, you see, when Hitler started. I stopped the publication; I had it all set to go, then this war came along, and as soon as the war finished, I found myself over here, so I couldn't say which ones were from America, that is, only the correspondence; in other words, they sent in a letter saying what they think, and so and so.

 * * * * * * *

JUDGE RAO: Just another question—may I have that exhibit, please—these letters from pages 38 to 48, how many of them came from the United States, if you remember?

THE WITNESS: I could not even make a guess because my mailing list—

JUDGE RAO: If you look at this Plaintiff's Exhibit 1, would that refresh your recollection as to how many letters came in from the United States, and how many letters came from Australia?

THE WITNESS: No, sir, I could not.

JUDGE RAO: Would you say they all came from the United States?

THE WITNESS: They came from Britain, China, some from the U. S. A.

The law is well settled that the provision of paragraph 1410, *supra,* for books, etc., of *bona fide* foreign authorship, means such as are wholly or substantially wholly of foreign authorship. See *Philipp Feldheim* v. *United States,* 23 Cust. Ct. 172, Abstract 53577, and cases cited therein. Consequently, where a substantial portion of the printed matter is not of foreign authorship, such printed matter may not be deemed to be of *bona fide* foreign authorship within the meaning of that phrase as used in said paragraph 1410.

In the *Feldheim* case, *supra,* we held that where a volume of essays contained a minimum of 10 per centum of material written by American authors, the volume was not wholly or substantially wholly of foreign authorship.

The collector in classifying the instant merchandise under that portion of paragraph 1410, *supra,* carrying the higher rate must be presumed to have found all facts essential to that classification. *United States* v. *I. Magnin & Co., Inc.,* 21 C. C. P. A. (Customs) 77, T. D. 46394; *United States* v. *Marshall Field & Co.,* 17 C. C. P. A. (Customs) 1, T. D. 43309; *United States* v. *Albers Bros. Milling Co. et al.,* 35 C. C. P. A. (Customs) 119, C. A. D. 380. It therefore

follows that he found that the magazines were not wholly or substantially wholly of foreign authorship.

In order to rebut the presumption of correctness inherent in such classification, it was incumbent upon the plaintiff to show not only where the collector erred, but also what was the proper classification for the merchandise. With respect to the 10 pages of letters, the importer was unable to prove that the authorship was foreign rather than American. The section of plaintiff's exhibit 1 devoted to correspondence with its readers is a distinctive feature of the magazine, and contributes greatly to the composite whole. In terms of proportion, it represents approximately 20 per centum of the total printed matter. It is too substantial a portion to be disregarded. Consequently, we must hold that the instant merchandise is not of *bona fide* foreign authorship.

All claims in the protest are therefore overruled. Judgment will be entered accordingly.