**No. 57543.**—Carey & Skinner, Inc. *v.* United States, protest 183337–K (Buffalo).

RAO, Judge: A Canadian publisher shipped to its American distributor 328,965 copies of a pamphlet entitled "Super Duper Comics." The collector of customs at the port of entry classified this merchandise as pamphlets of *bona fide* foreign authorship and, accordingly, assessed duty thereon at the rate of 7½ per centum ad valorem, pursuant to the provisions of paragraph 1410 of the Tariff Act of

1930, as modified by the trade agreement with the United Kingdom, 74 Treas. Dec. 253, T. D. 49753.

Plaintiff concedes that the involved articles fit the description applied by the collector but claims that they are more specifically provided for in paragraph 1726 of said act as periodicals and, hence, that they are entitled to free entry.

Paragraph 1726 of the Tariff Act of 1930 provides as follows:

Newspapers, undeveloped negative moving-picture film of American manufacture exposed abroad for silent or sound news reel, and periodicals; but the term "periodicals" as herein used shall be understood to embrace only unbound or paper-covered publications issued within six months of the time of entry, devoted to current literature of the day, or containing current literature as a predominant feature, and issued regularly at stated periods, as weekly, monthly, or quarterly, and bearing the date of issue.

The trial of this case was held in Buffalo, N. Y., where two witnesses were called, both of whom testified in behalf of plaintiff. They were Frank Howard, president of F. E. Howard Publications, Ltd., of Toronto, Canada, publisher of comic books and periodicals, including the merchandise at bar, and Cyril Vaughn Bell of Rotary Litho Co., Ltd., a printing and lithographing concern which printed the imported issue of "Super Duper Comics" and certain prior editions.

From an examination of the instant record, which contains inconsistencies and contradictory evidence, the following facts emerge: For the period from October 1945 to about August 1946, F. E. Howard Publications, Ltd., put out a monthly magazine, presumably under the title of "Super Duper Comics," consisting of black-and-white comics with a four-color cover. The 35,000 copies of each edition were distributed partly in Great Britain, partly in Canada. The Canadian copies, unlike those shipped to the United Kingdom, contained covers and bore the respective dates of issue.

In June 1946, the first full four-color edition was published, and, as in the case of the monthly series, was distributed in Canada and in Great Britain, with the Canadian copies containing both a cover and an issue date. Furthermore, there were indications on the cover page to the effect that "Super Duper Comics" in four colors would thenceforth be published on a bimonthly basis.

Nevertheless, and allegedly because of a paper shortage, although witness Howard freely admitted that his allotment of one carload of paper per month was adequate for the printing of 350,000 copies, the second edition of "Super Duper Comics" was not released until October 1946. It was explained that:

The delay was trying to get the thing rolling for American distribution too and trying to conserve as much paper for me to use for the American, because there is a big difference between printing 30,000 and 350,000.

A copy of this second edition, minus cover, is in evidence as plaintiff's exhibit 2.

After a part of the second edition had been sent to Great Britain, the British Board of Trade rescinded the publisher's permit for shipping overseas, apparently making it necessary for the publisher to seek a new market.

On January 29, 1947, F. E. Howard Publications, Ltd., entered into a contract (plaintiff's exhibit 3) with Publishers Distributing Corp. of New York City for the distribution of "Super Duper Comics" throughout the United States. By the terms of the contract, which was of 3 years' duration, F. E. Howard Publications, Ltd., agreed in part to regularly issue "Super Duper Comics" every 60 days while the contract remained in force and effect.

"Super Duper Comics," No. 3, the issue with which we are here concerned (plaintiff's exhibit 1), was shipped to the United States in April 1947 for release during the months of May–June 1947. Like its immediate predecessors, it contained a statement that it was a bimonthly publication, printed in Canada. The long delay between the issuance of plaintiff's exhibit 2, in October 1946, and plaintiff's exhibit 1, in May–June 1947, was explained in the following manner:

Because I had to find suitable art work for American distribution. And the quantity was so increased, from 35,000 to 350,000, I had to find sufficient paper. I had to get contracts from magazine distributors for the distribution of it. And it all took time.

The venture was a financial failure, and, as a consequence, plaintiff's exhibit 1 was the last edition ever published. Nevertheless, it may be said to have been sufficiently established by plaintiff's proof that at the time the involved pamphlets were shipped to the United States, it was the *intention* of the publisher to issue *subsequent* editions regularly every 2 months.

It was further established that plaintiff's exhibit 1, the number 3 issue of "Super Duper Comics," is a paper-covered pamphlet, showing thereon the date of issue; that it was issued within ·6 months of the time of entry; that it was distributed in Canada 2 weeks prior to entry into the United States; and that it contains current literature as a predominant feature.

In the light of this record and the terms of the proviso to paragraph 1726, *supra*, it is obvious that the only question in this case is whether the involved pamphlets were "issued regularly at stated periods." If they were, since in all other respects they meet the requirements of the provision, they are entitled to free entry. Otherwise, the collector's classification must stand.

Substantially this same question was raised in the case of *Tice & Lynch* v. *United States*, 24 Cust. Ct. 4, C. D. 1200, modified on grounds not here pertinent in *ibid.* 420, Abstract 54213. The publication there involved was the first edition of a series which the publisher intended to issue monthly. However, owing to a shortage of paper, the publisher was not able to effectuate his intention, and, after the printing of only three subsequent editions, which were released at irregular intervals, he abandoned the project. Concerning the question of whether the involved magazine was "issued regularly at stated periods," we had this to say:

\* \* \* The paragraph specifically requires that in order for a publication to be deemed a periodical it must be "issued *regularly* at stated periods." [Italics ours.] Mere intention to comply with the terms of the provision would, in our opinion, not be sufficient to establish its applicability, if the proof indicates that the intention was never effectuated. Irrespective of what factors may have intervened to prevent the publication of the magazine regularly at stated periods, as weekly, monthly, or quarterly, since it was not so published, the terms of the provision remain unsatisfied. *Williams & Wilkins Co.* v. *United States*, 22 Cust. Ct. 268, Abstract 52955. Since this court is lacking in equity jurisdiction (*Jacksonville Paper Co., a Corporation* v. *United States*, 30 C. C. P. A. (Customs) 159, C. A. D. 228), it cannot consider the extraneous circumstances which prevented the publication of this magazine at regular intervals.

Plaintiff here requests a reconsideration of the views expressed and the conclusion reached in the *Tice & Lynch* case, *supra*. In support of that request, it is urged particularly that the case of *Williams & Wilkins Co.* v. *United States*, cited by us, does not seem to be directly in point nor are there any prior decisions dealing with the question; that the dutiable status of imported merchandise should be governed by the conditions existing at the time of importation, and not by such subsequent acts as the abandonment of publication after importation; and that an important factor bearing upon the conditions existing at the time of importation is the intention of the publisher to issue these comic books on a regular bimonthly basis.

We have carefully reexamined our decision in the *Tice & Lynch* case, *supra*, bearing in mind these and other arguments advanced by plaintiff, and remain convinced that the conclusion there reached was a sound one. More particularly would we have been inclined to view the question as we there did had the instant record been before us when the matter was first considered, for it affirmatively appears in this case that, the intentions of the publisher to the contrary notwith-

standing, the only two prior published editions of the involved pamphlets were not issued at regular intervals. To be sure, the closing of the British market, the alleged existence of a paper shortage, and the preparation of material suitable for the American public serve to explain why the prior issues were off schedule, but the fact remains that no on-schedule issues ever appeared. We do not believe that the provision in question authorizes us to consider as relevant any circumstances other than the time when prior editions were published.

The language of the statute providing for the free entry of periodicals looks to past performances. An intention to publish at regular intervals, present at the time of importation, which is never carried out, and which is gainsaid by the irregular release of prior issues, does not meet the dictates of the statute.

Accordingly, we hold that the pamphlets at bar were not "issued regularly at stated periods, as weekly, monthly, or quarterly," within the meaning and intent of paragraph 1726 of the Tariff Act of 1930. The claim for free entry is, therefore, denied.

Judgment will be entered accordingly.