CAREY & SKINNER, INC. *v.* UNITED STATES (No. 4799)[1]

United States Court of Customs and Patent Appeals, November 9, 1954

*Allerton de C. Tompkins* for appellant.

*Warren E. Burger,* Assistant Attorney General (*Richard E. FitzGibbon, Richard H. Welsh,* and *William J. Vitale,* special attorneys, of counsel), for the United States.

[Oral argument October 13, 1954, by Mr. Tompkins and Mr. Welsh]

Before O'CONNELL, Acting Chief Judge, and JOHNSON, WORLEY, and COLE, Associate Judges

O'CONNELL, Acting Chief Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, Second Division, entered in conformity with its decision, Abstract 57543, 31 Cust. Ct. 263, overruling appellant's protest, and sustaining the classification of the Collector of Customs at the port of Buffalo.

The involved import is the May–June 1947 issue of a four-color, printed, illustrated publication of the so-called "comic magazine" type, entitled "Super Duper." The entry was classified by the collector as pamphlets of *bona fide* foreign authorship under paragraph 1410 of the Tariff Act of 1930, as modified by the Trade Agreement with the United Kingdom, 74 Treas. Dec. 253, T. D. 49753, and assessed with duty at the rate of 7½ per centum ad valorem.

The importer protested such action on the ground that the merchandise in question should enter duty-free as a periodical under the provisions of paragraph 1726 of the Tariff Act of 1930.

[1] C. A. D. 576.

It is conceded by appellant that if the imported publication is not a periodical under the terms of paragraph 1726, then it was properly classified under paragraph 1410. The pertinent portions of paragraph 1726 read as follows:

Par. 1726. Newspapers * * * and periodicals; but the term "periodicals" as herein used shall be understood to embrace only unbound or paper-covered publications issued within six months of the time of entry, devoted to current literature of the day, or containing current literature as a predominant feature, and issued regularly at stated periods, as weekly, monthly, or quarterly, and bearing the date of issue.

The only phrase in controversy is that which requires a periodical to be "issued regularly at stated periods, as weekly, monthly, or quarterly." If the involved "Super Duper" can be said to be issued regularly within the meaning of paragraph 1726, then the publication should be classified under that paragraph.

Two witnesses testified in behalf of the importer at the trial. One witness was the Canadian publisher of the import at bar, and the other was the printer. Several documentary exhibits were also received in evidence. Although the testimony taken below was frequently confusing, and sometimes even contradictory, the following facts are deduced from the record.

The involved import, marked for issuance in May–June 1947, was the third four-color pamphlet bearing the name "Super Duper," and the first to be imported into the United States. The previous four-color issue (No. 2) was marked for issuance in September–October 1946, and the earliest (No. 1) in June of 1946. The first two issues were distributed in Canada and Great Britain, and according to the testimony all were intended to be bi-monthly publications and were so marked, at least in Canada.

The publisher had also published a black-and-white magazine, apparently also entitled "Super Duper," which was distributed monthly in Canada and Great Britain from October of 1945 to about August of 1946.

In August of 1946, after part of the second four-color edition had been exported to Great Britain, the British Board of Trade cancelled the import license. The publisher thereupon began seeking another outlet for his magazine, and in January 1947 he concluded a three-year contract with a distributor for bi-monthly distribution in the United States of the four-color "Super Duper." The involved import, entered in April 1947, is the first issue under that contract.

However, the imported pamphlet was not a success, and the loss was so great on this issue that the publisher was forced to discontinue publication altogether.

Evidence was introduced in the nature of completed art work and distribution lists for later editions to support the publisher's statement

that he had *intended* to publish further regular, bi-monthly editions. There was also some evidence that the previous off-schedule issues were due, in part, to a paper shortage at that time.

In summary, therefore, it will be seen that appellant has shown that there was regular publication of a similar, but not identical, monthly magazine some nine months prior to issue of the involved pamphlet; that the involved publication, an intended bi-monthly, was published only three times in the course of a year; that this irregularity may not have been the fault of the publisher; and, finally, that it was the firm intention of the publisher to have regular issuance subsequently, from which he was prevented by circumstances beyond his control.

The main argument of the importer is that the controlling factor in determining whether or not a pamphlet is a periodical should be the *intention* of the publisher at the time of entry. Appellant cites cases stating the well-established rule that the conditions at the time of entry determine the dutiable status of merchandise. *Worthington* v. *Robbins*, 139 U. S. 337; *Five Per Cent cases*, 6 Ct. Cust. Appls. 291, T. D. 35508. He then argues, "Thus factors that *develop after* an article arrives in the United States should not govern its dutiable status unless the intention of Congress clearly sets forth a contingent status depending upon future developments." (Italics quoted.) Appellant maintains that the normal definition of periodicals includes publications *designed* to be periodicals, and suggests that Congress was simply defining the term "periodicals" in its normal sense, laying particular stress on the words "as weekly, monthly, or quarterly."

On this point, the Customs Court found that its case of *Tice & Lynch* v. *United States*, 24 Cust. Ct. 4, C. D. 1200 [1] was in point, and then reached the following conclusion:

We do not believe that the provision in question authorizes us to consider as relevant any circumstances other than the time when prior editions were published.

The language of the statute providing for the free entry of periodicals looks to past performances. An intention to publish at regular intervals, present at the time of importation, which is never carried out, and which is gainsaid by the irregular release of prior issues, does not meet the dictates of the statute.

The precise question presented here has not been ruled on by this court, and no controlling cases have been cited. The problem is essentially one of statutory interpretation, and therefore an analysis of the involved paragraph is appropriate.

Paragraph 1726 provides, *inter alia*, for the free entry of newspapers and periodicals. Congress might have stopped there, and left the interpretation of what constitutes newspapers and periodicals to the administrative tribunals and the courts. In fact, the act of March 3, 1883 provided simply for the free entry of "news-

---

[1] Modified on grounds not here pertinent in 24 Cust. Ct. 420, Abstract 54213.

papers and periodicals." However, in the act of October 1, 1890, Congress saw fit to add the following:

*but* the term "periodicals" as herein used shall be understood to embrace *only* unbound or paper-covered publications, containing current literature of the day and issued regularly at stated periods, as weekly, monthly, or quarterly. (Emphasis added.)

This language, with additions, has continued to the present day.

Several considerations compel us to reject appellant's arguments, and to find that the phrase in controversy is restrictive as well as definitive in nature.

First, it is significant that Congress added the modifying clause to the paragraph at all. To find that Congress was simply defining periodicals in its normal sense would be to find that it was doing a vain, unnecessary, and nugatory thing. Unless Congress wanted to exclude some things which might be considered periodicals, there would be no necessity to delineate the scope of the term.

Secondly, we note that Congress did *not* modify or define the term "newspapers." This omission lends significance to the limitations that were put on periodicals.

Finally, and most convincing, we note that the whole tenor of the clause is one of restriction. The modifying clause begins, *"but* the term 'periodicals' as herein used shall be understood to embrace *only."* (Emphasis added.) Hardly any wording could be imagined which would show more clearly the intent of Congress to set out specific requirements for a periodical. To interpret this clause as appellant suggests, it would be necessary to disregard the words "but" and "only." It is a basic rule of statutory construction that, if possible, significance and effect ahould be given to every word. *Ex parte Public Bank*, 278 U. S. 101.

For these reasons we conclude that a publication to be a periodical under the Act must, *in fact*, be issued regularly at stated intervals, and that a publication *intended* to be published regularly, or *designed* to be a periodical, is not of itself sufficient.

Appellant's further arguments to the effect that the irregularity of the earlier editions, the discontinuance of further editions through no fault of the importer, and that regular issuance had been shown by the monthly comic magazine, should be considered by the court, as of pertinent significance, were properly rejected by the Customs Court, citing *Tice & Lynch, supra*; *Jacksonville Paper Co., a Corp.* v. *United States*, 30 C. C. P. A. (Customs) 159, C. A. D. 228.

In the case at bar the last regular issue of the described monthly magazine was some eight or nine months prior to the importation here in issue, from which fact it might well be concluded that no weight could be given to the regularity of its issuance. Furthermore, the

monthly magazine was not the identical magazine involved here. It was in black and white instead of four colors, it was numbered in a different series, it was still being published after the first four-color "Super Duper" was issued, and there was evidence in the record tending to show that the publisher himself thought of it as a separate and distinct magazine.

From the foregoing, it is clear that there was sufficient evidence supporting the finding of the Customs Court that there had not been regular issuance of the involved publication. This court will not reverse the lower court on a question of fact except where the findings are without evidence to support them, or are clearly contrary to the weight of the evidence. *W. N. Proctor Company* v. *United States*, 40 C. C. P. A. (Customs) 33, C. A. D. 494.

In view of the conclusion hereinbefore stated, it is deemed unnecessary to state and pass upon other points raised by the respective counsel, and the judgment of the United States Customs Court is accordingly *affirmed*.